* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and, upon reconsideration, the Full Commission REVERSES in part and MODIFIES in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. Ohio Casualty Group is the carrier on the risk.
4. Plaintiff's average weekly wage was $115.50, which yields a compensation rate of $77.00.
5. Plaintiff's date of injury is January 19, 2002. Defendants accepted the compensability of plaintiff's claim by filing a Form 60 and paid temporary total disability compensation to plaintiff. Defendants have accepted the injuries to plaintiff's hip but denied any injury to plaintiff's back or right knee.
6. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
7. Industrial Commission forms and filings relating to this case were stipulated into evidence as Stipulated Exhibit 2.
8. The compensability of plaintiff's back condition, which was an issue at the Deputy Commissioner's hearing, has now been admitted by defendants. The remaining issues before the Commission are whether plaintiff sustained an injury to his right knee on January 19, 2002, and, if so, to what benefits is plaintiff entitled; whether plaintiff unjustifiably refused an offer of suitable employment; and what amount of compensation is due for the permanent partial disability rating to plaintiff's back.
 * * * * * * * * * * *
Based upon all the competent evidence, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was employed by defendant-employer as a golf ranger. Plaintiff worked part-time, three days a week, and was responsible for repairing greens, cleaning the golf course, keeping the play moving, and replenishing the water on the golf course at least once per day. Plaintiff used a golf cart to travel around the golf course while performing these duties.
2. On January 19, 2002, plaintiff approached the No. 6 tee and noticed that papers had blown onto the golf course and around the tee area. As plaintiff attempted to retrieve the papers on an incline, he slipped and fell on his back and buttocks area. Plaintiff experienced immediate pain in his back, hip and right leg.
3. Plaintiff reported the incident to Sybil Gardner, the assistant to the golf pro, who referred him to Tommy Cobb, acting general manager. Plaintiff indicated that he had been attempting to pick up trash on the golf course when he slipped and fell. Plaintiff told defendant-employer that he injured his back and wrist. Plaintiff did not mention any knee pain. At the time, plaintiff believed he did not have significant injuries and that the pain would resolve. Plaintiff continued to perform his work that day and played golf the following day.
4. Defendants accepted the compensability of plaintiff's injury by accident by filing with the Commission a Form 60 and began paying plaintiff temporary total disability compensation at the rate of $77.00 per week.
5. When his pain did not resolve, plaintiff presented to the Veterans Administration medical facilities in Charleston, South Carolina, on January 28, 2002. Plaintiff complained of right hip pain, swelling of the right leg and low back pain. The report from the VA specifically states that at that time plaintiff had no knee pain.
6. In April and May 2002 plaintiff attempted to work for Aflack but had to quit after approximately three weeks because he was unable to do the amount of walking required by the job.
7. Plaintiff was referred to orthopedic surgeon Dr. Thomas J. Chambers, who first treated plaintiff on September 12, 2002 for chronic problems relating to his hip. Although plaintiff described the fall on the golf course, he did not relate anything to Dr. Chambers about twisting or otherwise injuring his right knee. Plaintiff did complain about right knee pain, so Dr. Chambers ordered x-rays which showed tricompartmental osteoarthritis of the knee.
8. Dr. Chambers determined that plaintiff required a total hip replacement and this operation was performed by Dr. Chambers on October 21, 2002. Dr. Chambers supervised the post-surgical treatment relating to plaintiff's hip. As plaintiff progressed with his hip recovery, plaintiff continued to have pain in his back and knee.
9. Plaintiff had previously sustained a torn medial meniscus of the right knee while serving in the Air Force, for which he had knee surgery in 1961.
10. As of April 1, 2003, Dr. Chambers determined that plaintiff was at maximum medical improvement concerning his hip and released him to full duties "as tolerated." Dr. Chambers stated that after the hip replacement surgery plaintiff was capable of performing the functions of a golf ranger without any special restrictions. Plaintiff's only limitation on his ability to walk was due to his knee pain. Dr. Chambers indicated that plaintiff had a 15% rating to his whole person or 37% percent permanent partial disability rating to his lower right extremity. The ratings are based upon the American Medical Association guide. Dr. Chambers also indicated that plaintiff will require a total hip replacement in approximately eight years. Dr. Chambers completed a Form 18M indicating this future medical need.
11. Dr. Chambers was concerned that plaintiff's pain in his back and knee was not resolved by the hip treatment and referred plaintiff to a physiatrist.
12. In regard to the causation of plaintiff's right knee problems, in his note dated April 1, 2003, Dr. Chambers stated that plaintiff's knee problems were related to the medial meniscectomy that plaintiff had in the service and were not related to the work-related injury. According to Dr. Chambers, medial compartment knee arthritis is known to be a causally-related outcome from a medial meniscectomy and there was "no question" that the arthritis was causally related to the 1961 surgery. However, during his deposition, Dr. Chambers changed his opinion and stated that the fall exacerbated or aggravated plaintiff's pre-existing right knee arthritis. Dr. Chambers based his opinion on what plaintiff told him concerning an increase of right knee pain following the fall. As Dr. Chambers explained, "whether it was exacerbated by the fall or not, quite honestly, is completely dependent upon the patient history." However, Dr. Chambers acknowledged that plaintiff never mentioned that he twisted his right knee. "So, it's not beyond reason that he twisted his knee, but do I have — you know, I can't say that he stated he twisted his knee nor that I know he twisted his knee. Just that it makes sense with the mechanism of injury." If plaintiff did not twist his knee, Dr. Chambers conceded that factor might change his opinion about the exacerbation of plaintiff's right knee arthritis. In addition, Dr. Chambers stated that if plaintiff had a history of knee problems prior to the fall, he was less inclined to relate the knee condition to the fall.
13. The record of plaintiff's visit to the VA hospital on July 7, 2003, for an evaluation of his knee shows that plaintiff related his knee problems to the 1961 Air Force injury and reported a several year history of progressive swelling and pain with activities.
14. By letter dated October 9, 2003, Patrick Crean, general manager of defendant-employer, asked plaintiff to return to his regular job as a golf ranger. Plaintiff refused to return to the job because he believed it required too much walking and required lifting heavy water coolers. Plaintiff testified that he did not know how much the water coolers weighed. Defendants' witnesses estimated, and the Commission finds, that the weight was between 20-30 pounds. Mr. Crean also testified that plaintiff could have used several small coolers rather than one large one. The greater weight of the evidence also shows that the golf ranger job consisted primarily of riding in the golf cart and that tools were provided to repair divot marks and ball marks, so that plaintiff could have performed the job duties without significant bending, stooping or kneeling. The golf ranger position was substantially the same as being a golfer. Plaintiff's co-worker Kenneth Duncan testified that he played golf with plaintiff in September 2003 and that plaintiff had no difficulty playing golf and that he rode in the golf cart and could bend down to mark his ball on the green. Plaintiff testified at the Deputy Commissioner's hearing that he continued at that time to play golf twice a week. The Commission finds based on the greater weight of the evidence that the job offered to plaintiff was suitable and was within his restrictions. Plaintiff presented no evidence that he has looked for employment with any other employers.
15. Plaintiff was seen for an independent medical examination by orthopedist Dr. William L. Mills, on March 31, 2004 concerning his chronic back pain. Dr. Mills examined and evaluated diagnostic testing relating to plaintiff's back. Plaintiff's neurologic examination was normal. Plaintiff did not complain of right knee problems to Dr. Mills. Dr. Mills saw plaintiff for a second time on April 29, 2004. Based on his review of the March 13, 2002 and April 16, 2004 MRIs, Dr. Mills stated that plaintiff had degenerative disc disease and lumbar spondylosis, or arthritis of the spine, at L4-5. It was Dr. Mills' opinion and the Commission finds that the fall on January 19, 2002, aggravated the pre-existing degenerative changes in plaintiff's back.
16. As of April 16, 2004, plaintiff was at maximum medical improvement with respect to his back. Dr. Mills did not take plaintiff out of work and believed that plaintiff was able to perform the job duties of golf ranger, stating that "it certainly sounds like those are fairly-low-demand type activities." Dr. Mills assigned a 10% permanent functional impairment to plaintiff's back.
17. Dr. Mills indicated that plaintiff could require additional medical treatment, consisting of physical therapy and possible pain medication, to deal with flare-ups of back pain. No back surgery was recommended, but Dr. Mills suggested exercise and strength training, as well as a functional capacity evaluation.
18. Following the hearing before the Deputy Commissioner, Deputy Comissioner Holmes ordered a one-time evaluation of plaintiff's back and right knee by Dr. Ralph A. Liebelt at Triangle Orthopaedics. Dr. Liebelt reviewed all medical records from Dr. Chambers and Dr. Mills.
19. In describing the compensable incident to Dr. Liebelt, plaintiff said that he was coming down a wet embankment, slipped on leaves and fell, injuring his back and hip and twisting his right leg. Dr. Liebelt diagnosed degenerative disc disease with no specific neurological deficits in plaintiff's back and arthritis in the right knee. Based upon plaintiff's description of the fall, Dr. Liebelt determined that plaintiff's knee condition was aggravated by the injury by accident on January 19, 2002.
20. When presented at his deposition with the January 28, 2002 and February 26, 2002, VA hospital records showing no knee pain complaints and no report of a twisting injury, Dr. Liebelt agreed that he would have expected plaintiff to be experiencing knee pain at that time as a result of the fall. In response to his review of the VA record dated July 7, 2003, in which a history of several years of progressive pain and swelling in the right knee were noted, Dr. Liebelt responded:
 Again, the evidence is from his [plaintiff's] description to me. Certainly, you presented records that show his knee was progressively symptomatic. I think that the question is really more when it actually became more symptomatic. And there's certainly contradictory evidence. The inevitable result is that he presents now with a very symptomatic arthritic knee. I can only go by what he told me and what the medical records say, and that's my interpretation of both.
21. Dr. Liebelt indicated that plaintiff will require a total knee replacement in order to resolve his problems. If plaintiff does not have surgery, Dr. Liebelt assigned a 40% permanent functional impairment rating to plaintiff's right leg.
22. Dr. Liebelt also determined that plaintiff sustained an aggravation of a pre-existing back condition. Dr. Liebelt indicated that plaintiff was at maximum medical improvement with a 20% permanent partial disability rating to his back. Dr. Liebelt imposed restrictions of no repetitive bending, stooping, or squatting, and infrequent lifting restrictions of 35-50 pounds from waist up.
23. Dr. Liebelt was also of the opinion plaintiff will require future medical treatment, consisting of physical therapy and pain medications, relating to his back flare-ups.
24. As the result of the compensable injury by accident, plaintiff sustained an aggravation of his pre-existing degenerative back condition which resulted in a 15% permanent functional impairment to his back.
25. The greater weight of the medical evidence of record establishes that there is a substantial risk that plaintiff will need future medical treatment for his hip and back conditions.
26. The expert medical opinions causally relating the knee condition to the compensable injury were based upon plaintiff's contention that he twisted his knee during the fall. However, plaintiff did not mention twisting his right knee to the employer or to his doctors, nor did he describe any twisting or other type injury to his knee during his testimony at the Deputy Commissioner's hearing. The first and only time a twisting injury was reported by plaintiff was over two years after the fall when plaintiff described twisting his knee to Dr. Liebelt. Therefore, plaintiff failed to prove by the greater weight of the evidence that his right knee condition is causally related to the compensable fall.
27. This claim was defended upon reasonable grounds.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 19, 2002, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer that resulted in injuries to his hip and back but not to his right knee, which was the result of a non-work related condition. N.C. Gen. Stat. § 97-2(6).
2. As a result of his compensable injury by accident on January 19, 2002, plaintiff was temporarily totally disabled from any employment and entitled to receive temporary total disability compensation from the time that plaintiff stopped working at defendant-employer until October 9, 2003 when he unjustifiably refused an offer of suitable employment. Thereafter, plaintiff is not entitled to any compensation during the continuance of such refusal. N.C. Gen. Stat. § 97-32.
3. Assuming arguendo that the job offered by defendant-employer was not suitable employment, plaintiff also failed to prove continuing disability as a result of the compensable injury by accident. Plaintiff was not taken out of work by any doctor, was capable of some work but failed to show that he made a reasonable but unsuccessful effort to find employment, and he did not show that it was futile for him to seek employment due to other factors. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
4. As the result of the compensable injury by accident, plaintiff sustained a 15% permanent functional impairment to his back for which he is entitled to permanent partial disability compensation at the rate of $77.00 per week for 45 weeks. N.C. Gen. Stat. § 97-31(23).
5. Defendants are entitled to a credit for compensation that has been paid to date pursuant to the Form 60 in this case. N.C. Gen. Stat. § 97-42.
6. Plaintiff is entitled to receive all medical treatment incurred or to be incurred that would reasonably effect a cure or provide relief or lessen plaintiff's period of disability. Defendants shall pay for the treatment provided by Drs. Chambers, Mills, and Liebelt. Plaintiff will need and is entitled to a future hip replacement and future pain management and therapy for his back. N.C. Gen. Stat. §§ 97-25, 97-25.1.
7. Defendants defended this matter on reasonable grounds as there were legitimate issues for hearing. N.C. Gen. Stat. § 97-88.1; Sparks v.Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. For his temporary total disability, plaintiff is entitled to receive temporary total disability compensation at the rate of $77.00 per week from the time he left his employment with defendant-employer until October 9, 2003, when he unjustifiably refused suitable employment. Plaintiff's claim for additional compensation is suspended until such time as he ceases his refusal of suitable employment with defendant-employer or another employer.
2. Defendants shall pay to plaintiff $77.00 per week for 45 weeks for his 15% permanent functional impairment to his back. This amount shall be paid to plaintiff in a lump sum, except 25% shall be deducted and sent directly to plaintiff's attorney.
3. Defendants are entitled to a credit for compensation that has been paid to date.
4. Defendants shall pay all medical expenses resulting from plaintiff's compensable injury by accident on January 19, 2002, including treatment provided by Drs. Chambers, Mills, and Liebelt. Defendants shall also pay for a future hip replacement and future treatment for plaintiff's back condition, including pain management and physical therapy. The approved medical expenses do not include treatment for plaintiff's right knee which is not causally related to the compensable injury by accident.
5. Defendants shall pay the costs, including an expert witness fee of $400.00 to Dr. William Mills and $400.00 to Dr. Ralph A. Liebelt, if not paid by prior order.
This 1st day of November, 2006.
 S/
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
S/
THOMAS J. BOLCH
COMMISSIONER
S/
DIANNE C. SELLERS
COMMISSIONER